IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. _____
(To be supplied by the court)

RYAN SHAWHAN KEHOE, Plaintiff

v.

KEVIN BRADLEY KEHOE, Defendant.

**Jury Trial requested:**
(please check one)
___ Yes  ✓ No

# COMPLAINT

### A. PLAINTIFF INFORMATION

RYAN SHAWHAN KEHOE
10635 W 7TH AVE, APT 4
LAKEWOOD, CO 80215
(720) 336-9077
arckehoe@outlook.com

### B. DEFENDANT INFORMATION

KEVIN BRADLEY KEHOE
325 W UPPER FERRY ROAD, APT C-4
EWING, NJ 08628
(760) 579-8185
kevinbradleykehoe@gmail,com

### C. JURISDICTION

✗   Diversity of citizenship pursuant to 28 U.S.C. § 1332 (a matter between individual or corporate citizens of different states and the amount in controversy exceeds $75,000)

Plaintiff is a citizen of the State of Colorado, and Defendant is an individual who, at most times relevant to this complaint, is a citizen of the State of Colorado. Defendant is currently a citizen of the State of New Jersey.

D. **STATEMENT OF CLAIMS**

CLAIM ONE: **TORT OF DEFAMATION OF CHARACTER BY SLANDER**            .

Supporting facts:

(1) At all times relevant to this complaint, Plaintiff, Ryan Shawhan Kehoe, is a United States citizen and resident of the state of Colorado.

(2) At all times relevant to this CLAIM ONE, Defendant, Kevin Bradley Kehoe, is a United States citizen and resident of the state of Colorado.

(3) Plaintiff incorporates, by reference, to all paragraphs of this complaint as if fully set forth herein.

(4) CLAIM ONE is against Defendant, Kevin Bradley Kehoe.

(5) Plaintiff brings this CLAIM ONE before the Court as a cause of action for defamation of character by slander.

(6) Defendant published slanderous information about Plaintiff during a phone conversation to a third party during or around February 2023.

(7) Defendant also published slanderous information about Plaintiff via text messages sent to a third party during or around February 2023.

(8) Defendant also published slanderous information about Plaintiff to several other individuals which damaged Plaintiff's reputation and relationships with those individuals. Plaintiff has been unable to ascertain the specifics of what was said to those acquaintances as the damage done by Defendant was so severe that Plaintiff has not heard any response from anyone contacted.

(9) In the fall of 2022, Plaintiff had suspected that someone was spreading false information about him and began attempting to reach out to many of his contacts.

2

(10) By the end of the fall of 2002, Plaintiff sent a message to many friends and extended family, no less than 12 individuals, informing them of how someone was spreading false information about Plaintiff, and that the information was, or would be, presented in such a manner as to make the recipient of said information inclined to not answer Plaintiff's calls and not call, text, or e-mail Plaintiff back. However, only 2 individuals responded to Plaintiff's message, and Plaintiff was only one able to reach one of those individuals before Defendant had an opportunity to publish the slanderous information.

(11) Initially, Plaintiff was unsure who was spreading the slanderous misinformation.

(12) The first individual Plaintiff was able to contact, Justus Dehtan, was advised that if someone had not done so already, he would be receiving false information regarding Plaintiff that was intended to influence Mr. Dehtan to feel compelled to ignore Plaintiff's calls and not respond to Plaintiff's messages.

(13) Not more than four days later, Defendant called Mr. Dehtan and "made [Plaintiff] out to be some kind of monster" as Mr. Dehtan would later describe to Plaintiff.

(14) Mr. Dehtan also stated that while on the phone with Defendant, Mr. Dehtan suggested that Defendant leave Plaintiff alone to which Defendant responded in such a manner that it was clear to Mr. Dehtan that Defendant intends to "make [Plaintiff's] life miserable."

(15) Mr. Dehtan advised Plaintiff that it was clear Defendant has a personal vendetta against Plaintiff.

(16) The false allegations regarding Plaintiff which damaged Plaintiff's reputation were published to third parties by Defendant at which time Defendant knew those allegations to be false.

(17) At the time it was published, Defendant knew or should have known, as any reasonable person in the same situation would have known, the false information would damage the reputation of Plaintiff and cause him emotional distress.

(18) Defendant knew or should have known, as any reasonable person in the same situation would know, that his actions as stated herein would result in Plaintiff incurring personal injury.

(19) Defendant acted knowingly and willingly when he published slanderous information about Plaintiff.

(20) Plaintiff incurred damages as a direct result of Defendant's actions including, but not limited to, Plaintiff suffering from mental anguish, pain and suffering, and loss of enjoyment of life. Plaintiff reputation has been so tarnished that he has lost over a dozen friends and family members solely due to Defendant's actions.

## CLAIM TWO: TORT OF STALKING

Supporting facts:

(21) Plaintiff incorporates, by reference, to all paragraphs of this complaint as if fully set forth herein.

(22) At all times relevant to this CLAIM TWO, Defendant, Kevin Bradley Kehoe, is a United States citizen and was a resident of the state of Colorado until moving to the state of New Jersey in January 2023.

(23) CLAIM TWO is against Defendant, Kevin Bradley Kehoe.

(24) Plaintiff brings this CLAIM TWO before the Court as a cause of action for Defendant stalking Plaintiff by a pattern of behavior that was, and still is, intended to cause Plaintiff emotional distress.

(25) On February 20, 2023, Plaintiff received a phone call from Defendant at 08:39 P.M. Mountain Time. Plaintiff consented to recording the phone call, and said conversation was between two Colorado residents. It may be possible that Defendant was in the State of New Jersey when the conversation was recorded, however, New Jersey is also one-party consent state regarding any recording of a phone conversation.

(26) During the aforementioned phone conversation, Defendant stated he "…knows I.T. motherf[***]ers that are tracking [Plaintiff], and it's kind of hilarious…"

(27) Plaintiff and his wife each have a phone that been corrupted by stalkers to the point those phones cannot make or receive calls. Both phones were on contracted plans with phone carriers, however, neither phone could access the internet. Both phones would intermittently not allow Plaintiff or his wife to use the camera as those phones would both display an error message such as "the camera is being used by another application" despite no other application being open in either phone.

(28) Plaintiff and his wife both got new phones and new phone numbers, but those new devices could not make or receive phone calls after about a week of purchasing them.

(29) Plaintiff and his wife purchased a new sim card for a fifth device, and that phone could not make or receive or calls after only about four days of being received by mail.

(30) Plaintiff and his wife purchased a sixth sim card, and that sim card worked for about two weeks before not being able to make or receive calls.

(31) Currently, Plaintiff relies on wi-fi to make and receive phone calls using a service that

provides a sim card for regular service which Plaintiff has ordered and installed in his phone, but Plaintiff is unable to utilize said service only being able to make and receive phone calls when near a wi-fi signal that Plaintiff can access with a security passcode. Typically, Plaintiff is forced to use an unsecure wi-fi hotspot that is free and does not require a passcode.

(32) Plaintiff has since become knowledgeable and experienced with computer coding in an attempt to establish a defense against the attacks, but he remains a novice with only an ability to read and generally understand the language, or commands, used in the coding.

(33) Due to also having chronic trouble with his home internet service, Plaintiff has repeatedly had long conversations with the IT department of his internet service provider, hereafter referred to as "ISP-IT".

(34) Plaintiff advised his ISP-IT of the security issues that he was having and inquired as to what he could do to combat it.

(35) His ISP-IT advised Plaintiff that "someone has been repeatedly attacking [Plaintiff's] modem" using a brute force attack on at least one occasion. Plaintiff replied by stating he believed someone was currently in his modem and had remote control of his devices including his microphone and cameras.

(36) ISP-IT confirmed the outside presence of an unauthorized device, or hacker, who was utilizing an open port on Plaintiff's modem that was allowing said hacker to gain access all devices connected to Plaintiff's modem. The hacker then created open ports on all devices connected to Plaintiff's home network.

(37) Shortly thereafter, Plaintiff discovered malware had been installed on his laptop and his wife's laptop. This malware was cleverly installed in the temp folder of the infected

devices, a folder that malware removing software does not search when scanning for potential threats on a device. The malware was found within infected files that were also remotely installed in that temp folder without the device owner's knowledge or permission. Also, the settings of the recovery folder on the infected devices was changed so that the temp folder and recovery folder were exempt from being erased or altered in any way by the owner of the device. That setting was changed to prevent the owner of the device from removing the malware, and it prevented the device itself from removing the malware upon recovery of the operating system by re-installation of the software.

(38) Defendant knew or should have known, as any reasonable person in the same situation would know, that his actions as stated herein would result in Plaintiff incurring personal injury.

(39) Defendant acted knowingly and willingly when he committed slander against Plaintiff.

(40) Plaintiff incurred damages as a direct result of Defendant's actions including, but not limited to, Plaintiff suffering from mental anguish, pain and suffering, and loss of enjoyment of life.

**CLAIM THREE: <u>TORT OF HARRASSMENT</u>                          .**

Supporting facts:

(41) Plaintiff incorporates, by reference, to all paragraphs of this complaint as if fully set forth herein.

(42) At all times relevant to this CLAIM THREE, Defendant, Kevin Bradley Kehoe, is a United States citizen and was a resident of the state of Colorado until moving to the state of New Jersey in January 2023.

7

(43) CLAIM THREE is against Defendant, Kevin Bradley Kehoe.

(44) Plaintiff brings this CLAIM THREE before the Court as a cause of action for Defendant harassing Plaintiff.

(45) On January 10, 2023, Defendant harassed Plaintiff during a phone conversation Defendant initiated, during which Defendant continued to refuse to provide Plaintiff with his new address in an attempt to allude justice, and Defendant even tried to claim that he still lived in Colorado at the last known address Plaintiff had for him.

(46) During that same call, Defendant slandered Plaintiff's wife by making knowingly false claims of infidelity, and Defendant also made other emotionally scarring remarks to Plaintiff with the intent to cause Plaintiff pain and suffering.

(47) That same day, January 10, 2023, Defendant sent harassing messages to Plaintiff with threats that Plaintiff and Plaintiff's wife would "be in jail by the end of the quarter" and Defendant referred to Plaintiff's wife using a vulgar and obscene name, a standard for Defendant in his line of abuse toward Plaintiff and Plaintiff's wife.

(48) Defendant knew or should have known, as any reasonable person in the same situation would know, that his actions as stated herein were harassing and would cause Plaintiff to incur personal injury by emotional trauma.

(49) Defendant acted knowingly and willingly when he harassed Plaintiff.

(50) Plaintiff incurred damages as a direct result of Defendant's actions including, but not limited to, Plaintiff suffering from mental anguish, pain and suffering, and loss of enjoyment of life.

## CLAIM FOUR: <u>TORT OF STALKING BY PATTERN OF ABUSIVE BEHAVIOR</u>          .

Supporting facts:

(51) Plaintiff incorporates, by reference, to all paragraphs of this complaint as if fully set forth herein.

(52) At all times relevant to this CLAIM FOUR, Defendant Kevin Bradley Kehoe is a United States citizen and a resident of the of the State of Colorado.

(53) Plaintiff brings this CLAIM FOUR before the Court as a cause of action for Defendant demonstrating a pattern of abusive behavior toward Plaintiff with the intent to cause Plaintiff emotional harm.

(54) In February 2020, Plaintiff's father-in-law was receiving Hospice Care at home in his apartment located three doors down the hall from Defendant.

    (a) On night before Plaintiff's father-in-law died, Defendant was harassing Plaintiff, Plaintiff's wife, two of Plaintiff's brothers-in-law, Plaintiff's sister-in-law, and Plaintiff's father-in-law.

    (b) Defendant repeatedly ran past the front window of the apartment banging on the glass window or the door as he passed causing additional distress to a family in mourning of the soon-to-be deceased who had already left mentally but was still breathing until around dawn of the following morning.

(55) Later on in 2020, Defendant threatened to run Plaintiff over with his car.

    (a) The neighbor who lived underneath Defendant was witness to this and came to Plaintiff's aid calling Defendant an instigator who is always yelling out his window disrupting the neighbors. Plaintiff is actively attempting to locate said witness to provide a statement.

(b) Upon being threatened, Plaintiff called the police who attempted to contact Defendant by knocking on his front door of his apartment.

(c) Defendant refused to answer, and the police informed Plaintiff that an arrest warrant could be issued against Defendant due to the circumstances of the situation.

(d) The decision was ultimately left to Plaintiff, who declined the invitation to have an arrest warrant issued against Defendant.

(e) In court the next day, Plaintiff attempted to have a protection order issued but was told by the Court that the request was filed in the wrong courtroom. (*See Exhibit D*)

(56) In 2019, Defendant attempted to kick in the front door of Plaintiff's apartment. Plaintiff instructed Defendant to cease and desist, however, Defendant continued to violently kick Plaintiff's front door until Defendant tired.

(a) Due to Defendants aggressively violent actions that day, the door frame was displaced nearly three inches inward and almost gave completely.

(b) Plaintiff recorded the incident on his cell phone and is prepared to submit the video as evidence of the violent nature in which Defendant harassed Plaintiff.

(57) In 2019, Defendant hit Plaintiff's wife twice with less-lethal force with a "BOKKEN", a wooden sword the size of a Japanese Katana Sword that is typically used for martial arts training.

(a) Plaintiff's wife was first struck in her right arm with the "blade" end of the wooden sword as she blocked Defendant's attempt to cause further injury to Plaintiff's already injured back caused by an unrelated incident that did not involve Defendant. (*See Exhibit E*)

(b) Everyone involved in this incident knew Plaintiff's back was previously injured, later discovered to be two fractured vertebrae caused by the heavy trunk of Plaintiff's car closing due to failure of the hydraulic arms that hold it open.

(c) Had it not been for Plaintiff's wife absorbing the impact of the wooden sword in her forearm, Defendant would have struck Plaintiff's injured back while Plaintiff's back was turned to Defendant. After being struck with Defendant's weapon, Plaintiff's wife then began struggling with Defendant over the wooden sword as both of them had both their hands on it.

(d) At that time, Plaintiff's wife steered Defendant back into his apartment from which he came yielding that wooden sword just moments prior. Plaintiff followed right behind his wife in an effort to protect her from further injury Defendant was intending to inflict. At that time, Plaintiff did not see his wife get hit by the wooden sword due to his back being turned when it happened. Plaintiff turned around and saw the tug of war over the sword that was leading back into Defendant's apartment.

(e) As the struggle over the sword continued inside the apartment, Defendant's girlfriend, Shannon Landsdown, witnessed the struggle, stood up off the couch, and proceeded to charge toward Plaintiff's wife with the clear intention of coming to Defendant's aide.

(f) Acting in self-defense, Plaintiff's wife let go of the sword with her left hand and used her left elbow to neutralize Ms. Landsdown by knocking her to the ground with one hit.

(g) At that time, Defendant hit Plaintiff's wife on the left side of her chest using the handle end of the wooden sword that Plaintiff's wife let go of so that she could fend off the

second attacker.

(h) After Plaintiff witnessed his wife being struck in the chest with the sword by Defendant, Plaintiff reached over his wife's right shoulder with his right hand and grabbed Defendant by the collar of his shirt punched him in the face two or three times with his left hand. Once the threats were neutralized, Plaintiff and his wife proceeded downstairs and into their apartment without further incident.

(58) At any time, Plaintiff and his wife have not feared for their physical safety because of Defendant or any of his friends or associates. Unfortunately, that lack of ability to cause Plaintiff physical harm, which Defendant has repeatedly attempted to no avail, has led Defendant down a path that has him focusing on inflicting mental pain and suffering upon Plaintiff in what is best described as psychological warfare.

(59) On March 16, 2019, Defendant stole a beloved porch ornament from Plaintiff's porch, a limited-edition hand carved wooden bear created by a semi-famous local sculpture artist. Though eventually returned, the theft further demonstrates how Plaintiff and his wife were not safe at home from Defendant's harassment.

(60) On March 16, 2019, and March 17, 2019, Defendant made obscene gestures in a threatening manner directed at Plaintiff and his wife who saw the gestures on their home video surveillance system installed, in part, to document Kevin Kehoe's harassing behavior. (*See Exhibit F*)

(61) In December 2018, Defendant punched the front window of Plaintiff's apartment, a standard practice in Defendant's harassment which began Plaintiff and his wife moving into the building just four months prior to the window breaking incident  The window exploded and glass went flying all over Plaintiff's living room as a result.

(62) In 2011, Defendant and Plaintiff moved to Colorado and shared an apartment in Aurora. On one particular night in that apartment in Aurora, Defendant blocked the doorway to Plaintiff's room so Plaintiff could not go in and shut the door to avoid his instigating younger brother. Plaintiff does not remember much about the events that followed until waking up in a hospital bed the next morning.

    (a) Plaintiff investigated the scene of the incident the next day and also conferred with Defendant about what had happened. Defendant informed Plaintiff where they argued, and Plaintiff had fallen to the ground after being pushed by Defendant. Plaintiff discovered a dent in the flat metal door railing that ran across the floor of the hallway closet door frame. At that point, Plaintiff realized that he would have had to hit the back of his head pretty hard to cause such a dent. Plaintiff rubbed the back his head which he then discovered was tender and hurt when touched.

    (b) Defendant claimed that after being pushed to the ground, Plaintiff got right up charged Defendant who retreated into Plaintiff's room and was backed up against the far wall when Plaintiff punched Defendant in the arm. The single punch broke Defendant's arm, and Defendant was taken to hospital by ambulance.

    (c) According to his mother, Plaintiff called her no less than four or five times after the paramedics left with Defendant. She claims that Plaintiff asked her what happened to Defendant, she told Plaintiff about the incident to which Plaintiff would acknowledge, hang up the phone, and then call her right back about ten seconds later asking what happened to Defendant. This cycle repeated a few times, and she grew increasingly concerned until she told Plaintiff to hang up and call 911 and tell them that Plaintiff needed an ambulance. Plaintiff still called his mother again, at least

one or two more times, before finally calling 911.

(d) Plaintiff awoke in a hospital and did not know where he was or how he got there.

(e) Plaintiff was misdiagnosed being treated as an alcoholic who blacked out instead of being treated for a concussion.

(f) Plaintiff and Defendant shared no more than a pint of whiskey the night of the incident, but Defendant alleged that Plaintiff was drunk and out of control when the incident occurred leading to the misdiagnosis thereby interfering or otherwise depriving Plaintiff of proper medical care.

(63) Plaintiff has since suffered a clinically diagnosed concussion due to an unrelated incident that did not involve Defendant. Therefore, Plaintiff can absolutely state that he suffered a concussion on the night of the broken arm incident having first-hand knowledge experiencing a clinically diagnosed concussion.

(64) Defendant knew or should have known, as any reasonable person in the same situation would know, that his actions as stated herein would result in Plaintiff incurring personal injury.

(65) Defendant acted knowingly and willingly when he committed the aforementioned acts against Plaintiff.

(66) Plaintiff incurred damages as a direct result of Defendant's actions including, but not limited to, Plaintiff suffering from mental anguish, pain and suffering, diminished capacity to work, and loss of enjoyment.

## CLAIM FIVE: <u>TORT OF INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS</u> .

Supporting facts:

(67) Plaintiff incorporates, by reference, to all paragraphs of this complaint as if fully set forth herein.

(68) At all times relevant to this CLAIM FIVE, Defendant, Kevin Bradley Kehoe, is a United States citizen and was a resident of the state of Colorado until moving to the state of New Jersey in January 2023.

(69) Plaintiff brings this CLAIM FIVE before the Court as a cause of action for emotional distress Defendant intentionally inflicted on Plaintiff.

(70) All of the incidents listed throughout this complaint were designed to inflict pain and suffering upon Plaintiff, and all were pre-meditated or otherwise conspired by Defendant.

(71) Defendant knew or should have known, as any reasonable person in the same situation would know, that his actions as stated herein would result in Plaintiff incurring personal injury.

(72) Defendant acted knowingly and willingly when he intentionally inflicted emotional distress upon Plaintiff.

(73) Plaintiff incurred damages as a direct result of Defendant's actions including, but not limited to, Plaintiff suffering from mental anguish, pain and suffering, diminished capacity to work, and loss of enjoyment.

## CLAIM SIX: <u>TORT OF THEFT OF PROPERTY</u>

Supporting facts:

(74) Plaintiff incorporates, by reference, to all paragraphs of this complaint as if fully set forth herein.

(75) At all times relevant to this CLAIM SIX, Defendant Kevin Bradley Kehoe is a United States citizen and a resident of the of the State of Colorado.

(76) Plaintiff brings this CLAIM SIX before the Court as a cause of action for theft of property.

(77) On or around December 25, 2020, Defendant visited Florida and entered the residence of Sandra and Roger Kehoe in Tampa.

    (a) Sometime during that visit, Defendant removed some of Plaintiff's persona property without Plaintiff's knowledge or consent.

    (b) That property was part of an ongoing replevin case in Florida as Sandra and Roger Kehoe had denied Plaintiff his personal property back in August 2020.

    (c) The wrongful detention of said property led to a replevin case, during which time Plaintiff recovered several items from Defendant.

(78) During a phone conversation recorded legally by Plaintiff, Defendant admits to stealing said property and claimed that Plaintiff could try to take Defendant to Court regarding the theft, "but it will never hold." (*See Exhibit B, lines 00-00*)

(79) Not all of Plaintiff's personal property was recovered as a result, and it is believed that Defendant stole more property that he did not disclose to Plaintiff. Furthermore, Defendant stated the value of some of the missing items demonstrating his knowledge of the current fair market value which could only be known by him if he, or someone acting on his behalf, sold, or attempted to sell Plaintiff's property.

(80) Plaintiff has received information from a confidential source that Defendant received a total in an amount no less than $17,125 for Plaintiff's property that he, or someone acting on his behalf, stole from where it was stored and then sold to an unknowing buyer. Plaintiff's confidential source has requested that Plaintiff not supply any information that would allow Defendant to who Plaintiff's source is in fear of retaliation by Defendant.

(81) Defendant acted knowingly and willingly when he stole Plaintiff's personal property from where it was stored in Florida.

(82) Defendant knew or should have known, as any reasonable person in the same situation would know, that his actions as stated herein would result in Plaintiff incurring personal injury.

(83) Plaintiff incurred damages as a direct result of Defendant's actions including, but not limited to, Plaintiff suffering from mental anguish, pain and suffering, diminished capacity to work, and loss of enjoyment of life.

**ADDITIONAL INFORMATION:**

(84) Plaintiff has extensive documentation of Defendant's actions alleged herein, and said documentation is available upon request and will be provided as evidentiary support during discovery and at trial.

(85) Plaintiff has audio recordings of phone conversations in which Defendant confess to stealing Plaintiff's property and taunts Plaintiff causing him to suffer emotional pain and suffering.

(86) Plaintiff has security camera footage of Defendant making violently aggressive and obscene gestures directly into Plaintiff's cameras.

(87) Plaintiff has the Police report which confirms that Defendant threatened to run Plaintiff

over with his car.

(88) Plaintiff has s witness to whom Defendant published slanderous information about Plaintiff so as to damage Plaintiff's reputation. That witness shall provide a written statement, under oath, attesting to Plaintiff's claims that Defendant has a personal vendetta against Plaintiff and has been making Plaintiff needlessly suffer.

(89) Plaintiff has another witness, his wife, who shall provide a statement, under oath, that further supports Plaintiff's claims.

### E. REQUEST FOR RELIEF

Plaintiff respectfully requests relief as follows:

(1) Injunctive Order issued by the Court instructing Defendant to cease and desist, or otherwise refrain from, any further acts of slander, libel, harassment, stalking, and intentionally inflicting emotional distress on Plaintiff and Plaintiff's wife.

(2) Injunctive Order issued by the Court instructing Defendant to either (a) make a public apology to Plaintiff and Plaintiff's wife for the slander, libel, stalking, harassment, theft of property, and intentional infliction of emotional distress, OR (b) contact each individual to which Defendant published damaging information regarding Plaintiff reputation and Plaintiff's wife reputation. Either way, some form of a statement of retraction or correction regarding all information that Defendant published which damaged Plaintiff's reputation and Plaintiff's wife reputation is appropriate, necessary, and is in the best interest of justice.

(3) Compensatory relief in an amount to be no less than $76,250 for:
   a. pecuniary damages in an amount no less than the amount Defendant received from the unlawful sale of property that rightfully belonged to Plaintiff, $17,125.

  b. non-pecuniary damages in an amount to be no less than $21,000.

  c. punitive damages in the amount of $38,125.

(4) Compensatory relief for any legal costs and fees Plaintiff incurs, should there be any, that have not yet been realized such as, but not to be limited to, attorney costs and fees.

(5) All other relief the Court deems appropriate and necessary.

### F.  PLAINTIFF'S SIGNATURE

I declare under penalty of perjury that I am the plaintiff in this action, that I have read this complaint, and that the information in this complaint is true and correct. *See* 28 U.S.C. § 1746; 18 U.S.C. § 1621.

Under Federal Rule of Civil Procedure 11, by signing below, I also certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending or modifying existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

_____[signature]_____
(Plaintiff's signature)

_____7-10-2023_____
(Date)

(Revised February 2022)